No. 30,341.

MOUNTAIN IRON AND SUPPLY COMPANY, *Appellee*, v. B. F. BRANSON et al., *Appellants*.

(8 P. 2d 407.)

Opinion filed March 5, 1932.

*J. M. Pleasant,* of El Dorado, for the appellants.

*J. B. McKay,* of El Dorado, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: The appeal in this case is taken by four of the five defendants against whom a judgment had been rendered in

favor of the plaintiff upon an account for certain sucker rods, valve rods, pony rods, tubes, boxes and pins, in the sum of $328.15, for use in pumping oil from a well on a certain eighty-acre tract on which the defendants were cotenants and operating a producing well.

The appellants together owned a one-eighth interest in the well, its equipment and product, and allege errors as to the introduction of evidence, the insufficiency thereof to support the findings, error in the conclusions of law and the overruling of the motion for a new trial, but they argue and present in this appeal only the insufficiency of the evidence and the findings to establish a mining partnership. The appellee directs our attention to the fact that the petition not only alleges the existence of a mining partnership, but also that the defendant Branson was the duly authorized agent of the four appealing defendants. The answer was verified, which placed the burden on the plaintiff of establishing either or both of these allegations.

The trial court made extended findings of fact to the effect that defendant Branson acquired an oil and gas lease on this eighty-acre tract and assigned to each of these four appellants fractional interests therein, retaining substantially the remaining part thereof himself; by oral agreement with these four appellants he drilled a well for a definite compensation, of which each of them promptly paid his part; the agreement to drill included furnishing the well with pump and other equipment ready for operation; initial production from thirty-five to fifty barrels of oil per day was obtained in July, 1924, and it diminished in quantity during its operation until it was shut down in January, 1931, when it was only producing three barrels per day; there was in the oral agreement for drilling and equipping the well no provision about its operation; immediately after production was obtained all those interested in the lease signed division orders for the marketing of the oil, and these four appellants regularly received their proper shares of the sale price of all the oil produced therefrom; defendant Branson has been in the active charge and management of the well and the leasehold at all times since the commencement of the well; he hired the pumper and for two years paid him, but later the pumper collected his wages from the defendants on a *pro rata* basis; when the pumping engine wore out all the defendants knew of that condition and Branson arranged for a new one and each paid his share of the expense of installing it; the four appellants knew at all times that Branson was managing and operating the well and made no protest—

however, the only expense they have thus far paid has been the wages of the pumper, the expenses of installing the new engine and one barrel of gasoline ordered by one of them in an emergency; they did not have actual knowledge that the material furnished by plaintiff was needed or had been procured until it had been furnished and was in use; and that it was purchased in March, 1929, on the order of Branson and used from that time until the well was shut down in January, 1931.

From these findings the trial court concluded as a matter of law that the plaintiff was entitled to recover against all five of the defendants, but does not state in such conclusion whether it was on the ground of agency or mining partnership.

On the question of agency there was the direct evidence of Branson as to what he did concerning the operation of the well, after having had a personal talk with each of the interested parties with reference to the management and operation of the well, and the testimony of W. S. Marshall, one of the appellants, on cross-examination, as follows:

"Mr. Branson has been looking after the property, doing such things as employing the pumper, at all times since the well was drilled. I have not looked after it myself, and have relied on Mr. Branson to do so."

In addition to this direct evidence on the question of agency, the facts and circumstances enumerated in the findings are strong and convincing.

"The authority of a superintendent of coal mines to speak and act for his employer may be sufficiently established by facts and circumstances, notwithstanding a want of direct evidence of his appointment and a verified denial of such authority." (*Hilton v. Sheridan Coal Co.,* 132 Kan. 525, syl. ¶ 2, 297 Pac. 413.)

"To establish the relation of agency an express appointment and an acceptance thereof is not essential, but it may be implied from other facts, such as the statements of the parties, their conduct and the relevant circumstances." (*Wilson v. Haun,* 97 Kan. 445, syl. ¶ 1, 155 Pac. 798.)

There was ample evidence to support the finding of the trial court that Branson was in active charge and management of the well during all the time of its production, and that finding would justify a conclusion of his being the authorized agent of the four appellants.

As to the relation of the defendants constituting a mining partnership, as alleged by the plaintiff, the contention of the appellants is that these five defendants were simply cotenants or tenants in com-

mon, and that neither a general partnership nor a mining partnership existed; that to constitute either required a contract, either express or implied, of which there was neither, citing *Lumber Co. v. Marshall,* 109 Kan. 172, 197 Pac. 861. The claim of the plaintiff in that case was that the enterprise was a joint adventure and the court did use the language relied upon by the appellants as to the necessity of establishing a contract, either express or implied, for either a joint adventure or a partnership. There was no contention in that case that the relation was a mining partnership, although the business concerned the drilling of an oil well. The defendant in that case was interested in having the well drilled because he owned oil and gas leases in that vicinity and agreed with the company drilling the well to pay half of the balance of the expense after other contributions were made, and after the well was finished he paid the oil company the full share he had promised. The court held he was not liable to the lumber dealer for lumber sold to the drilling company and used in drilling the well.

A mining partnership is distinguished in many ways from a trading partnership. It can exist between cotenants or coöwners only while they are engaged in the actual operation of the mine or well, and does not cover any period before or after actual operation, as was held in *Huston v. Cox,* 103 Kan. 73, 172 Pac. 992.

"Mining partnerships are indulged between coöwners only when they actually engage in working the property. Before actual operations begin, and after actual operations cease, they are simply cotenants, unless, of course, an ordinary partnership has been formed." (p. 76.)

Another distinction as brought out in the opinion in the case of *Snider v. Davidson,* 105 Kan. 661, 185 Pac. 724, is that when the cotenants engage in any other work or enterprise than production and marketing the same they immediately become a general partnership, as in that case they undertook to secure and sell leases on other property in the same field. But against the urgent contention of the appellants in this case, the main distinguishing feature between a mining partnership and a trading one is that the former can be created without an express agreement by the evident intention of the parties involved and its existence may be established by the inferences to be drawn from the evidence showing the conduct of the parties and the surrounding circumstances.

"The creation of a mining partnership is dependent upon the intention of the parties.

"No express declaration of partnership is essential to the establishment of partnership rights where the intention of the parties may be gathered from the surrounding circumstances and their conduct with reference thereto. . ." (40 C. J. 1144.)

"The existence of a partnership in a given case is a question of fact depending for its solution upon inferences to be drawn from the evidence adduced, but the question whether ascertained facts constitute a partnership is one of law." (40 C. J. 1147.)

"Where the several owners of a mine unite in working it, they form what is termed a mining partnership, whether they are tenants in common, lessees, or owners in any other relation. In general every agreement for the working of a mine is such a partnership except where there has been an express agreement to constitute a full trading partnership; and it is not necessary to effect its formation or to continue its existence that there be an express agreement to become partners, or to share the profits and losses of mining. While a mining partnership may be created by the express contract of the parties, it may be inferred also from their acts, it being necessary only—and this is essential—that the coöwners of the property unite in operating or working the mine." (18 R. C. L. 1200.)

The finding of the trial court showing the surrounding circumstances and the conduct of these five defendants during the six and one-half years of the actual operation of this well of which, as well as its equipment, they were coöwners, and their sharing regularly in its production during all this time and for nearly two years after the material covered by this claim was furnished by plaintiff and used by them in the operation of the well, clearly establishes and creates a mining partnership, as defined and distinguished by the above and other authorities, and entitles the plaintiff to recover from the appellants as well as from Branson.

The judgment is affirmed.